ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUL 21 2022

at ___ o'clock and ___ min. ___ M
CLERK, U.S. District Court

CLARE E. CONNORS #7936
United States Attorney
District of Hawaii

MOHAMMAD KHATIB
Assistant U.S. Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii 96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
Email: Mohammad.Khatib@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. NO. CR22-00058 SOM |
| Plaintiff, | INDICTMENT |
| vs. | [18 U.S.C. § 1349; 18 U.S.C. §§ 1343 and 1346; 18 U.S.C. § 1956(a)(1)(B)(i)] |
| PAUL JOSEPH SULLA, JR., and GARY CHARLES ZAMBER, | |
| Defendants. | |

## INDICTMENT

The Grand Jury charges:

<u>Introductory Allegations</u>

At times material to this Indictment:

## I. *The defendants*

1.      PAUL JOSEPH SULLA, JR., the defendant, was a resident of the
County of Hawaii ("the County").  SULLA was licensed to practice law in the
State of Hawaii.

2.      GARY CHARLES ZAMBER, the defendant, was a resident of the
County.  ZAMBER was licensed to practice law in the State of Hawaii.

## II. *The County of Hawaii's Affordable Housing Policy and its Office of Housing and Community Development*

3.      The County's Office of Housing and Community Development
("OHCD") was responsible for the planning, administration and operation of the
County's housing programs.  The OHCD was created to assist in the development
of viable communities that provided decent and affordable housing for residents of
the County.

4.      The County maintained an affordable housing policy that was set forth
in Chapter 11 of the Hawaii County Code.  A key objective of Chapter 11 was to
"require residential developers to include affordable housing in their projects or
contribute to affordable housing off-site."  Developers could satisfy this
requirement either by building a specified number of affordable units in their

2

projects or within a fifteen-mile radius of a project site, or by conveying land with infrastructure to the County or non-profit entities approved by the County. The requirement was designed to provide housing units that could be bought or rented at amounts deemed affordable to individuals whose household incomes met certain specified income guidelines.

5.      Residential developers would earn Affordable Housing Credits ("AHCs") based upon the number of affordable housing units constructed and made available to qualified households. If residential developers constructed new affordable housing units that exceeded County requirements, they could earn "excess" AHCs. Such excess AHCs could be sold or transferred to other developers, for their use in satisfying affordable housing requirements for other projects. Any transfer of AHCs was subject to County approval.

6.      Before obtaining final approval for any residential project subject to affordable housing requirements, developers were required to enter into an Affordable Housing Agreement ("AHA") with the County specifying the number of homes or lots that would be made available at affordable prices, or that the developer would use excess AHCs to satisfy its requirements.

7.      Between September 2006 and December 2018, Alan Scott Rudo worked at the OHCD as a Housing and Community Development Specialist. In that role, he was responsible for ensuring residential developers complied with the

County's affordable housing requirements. Rudo reviewed proposed developments and made recommendations on whether the County should enter into AHAs, which would be signed by developers and the County Housing Administrator, Corporation Counsel and Mayor. In addition, Rudo made recommendations on whether to accept land conveyances to the County or non-profit entities for the provision of affordable housing.

### III. *The public's right to honest services*

8.      The OHCD, the County and its citizens had an intangible right to the honest services of their public officials. As an employee of the County, Rudo owed a fiduciary duty of honesty and loyalty to the citizens of the County to act in the public's interest and not for his personal enrichment. Rudo was prohibited from taking official acts in matters in which he had a personal financial interest, and owed a duty to perform his work free from bribery or kickbacks. Under the County's code of ethics, Rudo was specifically prohibited from soliciting or accepting any money, fee, commission, credit, gift, thing of value, or compensation of any kind which was provided, directly or indirectly, in exchange for official action and assistance.

## IV. *The agreement to use jointly owned companies to deceive the County, accept bribes and kickbacks and thereby to breach Rudo's fiduciary duty of honesty and loyalty*

9.     SULLA, ZAMBER, Rudo, and Rajesh P. Budhabhatti agreed to use companies that they jointly owned and controlled to deceive the County and its citizens into believing that Rudo was performing his work honestly and loyally, when in fact Rudo was taking official acts influenced by his receipt of bribes and kickbacks.   SULLA, ZAMBER, Rudo and Budhabhatti collectively created, owned, managed and controlled three limited liability corporations (Luna Loa Developments, LLC, West View Developments, LLC, and Plumeria at Waikoloa, LLC) that purported to provide affordable housing.  The conspirators agreed that Rudo would use his position to cause official acts allowing their companies to receive land and AHCs, all while concealing Rudo's personal interest and involvement in the companies, and the fact that he would receive proceeds derived from AHAs and transactions approved by the County.

### Count 1
### Conspiracy to Commit Honest Services Wire Fraud
### (18 U.S.C. § 1349)

10.     The allegations contained in paragraphs 1 through 9 are incorporated herein.

5

11.     In or about and between December 2014 and October 2021, both dates being approximate and inclusive, within the District of Hawaii and elsewhere, PAUL JOSEPH SULLA, JR. and GARY CHARLES ZAMBER, the defendants, together with Alan Scott Rudo and Rajesh P. Budhabhatti, who are charged elsewhere, and others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud and deprive the OHCD, the County and its citizens of their intangible right to the honest services of Rudo through bribery and kickbacks, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted, by means of wire communications in interstate commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, sections 1343 and 1346.

## I. *The object of the conspiracy*

12.     The object of the conspiracy was to make it appear that Rudo was faithfully discharging his duties of honesty and loyalty to provide affordable housing to the County and its citizens, when in fact his official acts were influenced by an agreement to take bribes and kickbacks from SULLA, ZAMBER, and Budhabhatti, all while concealing Rudo's financial and personal interest in various matters in which he took official acts.

6

## II. *The manner and means of the conspiracy*

13.    The manner and means by which SULLA, ZAMBER, and their co-conspirators sought to accomplish the objectives of the conspiracy included, among others, the following:

a.    SULLA, ZAMBER, Rudo, and Budhabhatti collectively created, owned, managed, controlled and used Luna Loa Developments, LLC ("Luna Loa"), West View Developments, LLC ("West View") and Plumeria at Waikoloa, LLC ("Plumeria") to make it appear as if those companies would develop affordable housing, when in fact they had no intention to do so.  Those companies, as well as at least two other limited liability corporations and two trusts, were used to deceive the OCHD, the County and its residents, and to obtain and distribute AHCs, land and money, in the manner described below.

b.    Rudo participated in the drafting of AHAs designed to benefit Luna Loa, West View, and Plumeria, which were submitted to the OHCD and falsely promised that the companies would develop affordable housing.  In fact, the defendants and their co-conspirators intended to use the companies solely as conduits to receive both land and AHCs that could then be sold, with the proceeds distributed among the conspirators.

c.      The conspirators used Rudo's official position as a Housing and Community Development Specialist to ensure that the OHCD approved the AHAs benefitting Luna Loa, West View, and Plumeria.

d.      SULLA, ZAMBER, and their co-conspirators deceived the County into entering AHAs for the development of land in Waikoloa, Kailua-Kona and South Kohala, based on false promises that their companies would develop affordable housing.  Under the AHAs, Luna Loa, West View and Plumeria received AHCs and a land conveyance having an aggregate value of at least $10,980,000.  Despite receiving these awards, the conspirators did not develop any affordable housing units as promised.

e.      SULLA, ZAMBER, and their co-conspirators thereafter sold or transferred the AHCs and land, and distributed the proceeds among themselves, with Rudo's share constituting bribes and kickbacks received in return for his official acts in obtaining the County's approval of the AHAs.

f.      SULLA, ZAMBER, and their co-conspirators failed to disclose that Rudo's official acts on behalf of the County were tied to an agreement to accept bribes and kickbacks, and that he actually received and attempted to receive bribes and kickbacks totaling at least $1,817,716.  The conspirators further concealed the fact that Rudo had control over the companies involved, as well as a financial interest in the particular AHAs and transactions in which he took official acts.

8

g.     To accomplish their objectives, SULLA, ZAMBER, and their co-conspirators made, or caused to be made, various interstate wire communications, including emails concerning the approval of AHAs, the sale of both land and AHCs and the wire transfer of the proceeds of various transactions.

All in violation of Title 18, United States Code, Section 1349.

Counts 2 through 7
Honest Services Wire Fraud
(18 U.S.C. §§ 1343 and 1346)

### I. *The scheme to defraud*

14.     The allegations contained in paragraphs 1 through 8 are incorporated herein.

15.     In or about and between December 2014 and October 2021, both dates being approximate and inclusive, within the District of Hawaii and elsewhere, PAUL JOSEPH SULLA, JR. and GARY CHARLES ZAMBER, the defendants, together with Alan Scott Rudo and Rajesh P. Budhabhatti, who are charged elsewhere, and others, did knowingly and with intent to defraud, devise, participate in, and execute a scheme to defraud and deprive the OHCD, the County and its citizens of their intangible right to the honest services of their public officials through bribery and kickbacks, by means of materially false and fraudulent pretenses, representations and promises, and omissions of material facts, and the concealment of material information.

9

## II. *The false statements, representations, promises, omissions and concealment of material information*

16.     The false statements, representations and promises made as part of the scheme to defraud, and the omissions of material facts and concealment of material information, are set forth in paragraph 13 and its subparagraphs, which are incorporated and realleged herein. As to the three AHAs awarded to Luna Loa, West View and Plumeria, SULLA, ZAMBER, Rudo and Budhabhatti further committed the acts specified below, which collectively and falsely made it appear as if Rudo was faithfully discharging his duties of honesty and loyalty to provide affordable housing to the County and its citizens, and concealed the fact that his official acts were being influenced by an agreement to receive, and the actual receipt of, bribes and kickbacks.

### A. *The South Kohala property*

17.     On or about December 17, 2014, Budhabhatti formed Luna Loa, a company he owned along with ZAMBER and Rudo, and for which SULLA served as an attorney.

18.     Rudo thereafter recommended and, on or about February 4, 2015, secured the OHCD's approval of an AHA between the County and Luna Loa ("AHA 1"). AHA 1 granted 212 AHCs to Luna Loa in exchange for a promise to develop 106 affordable housing units on approximately 4.6 acres of land in South Kohala, Hawaii ("the South Kohala Property") that Luna Loa did not own. While

participating in the OHCD's approval process, Rudo did not disclose his ownership interest in Luna Loa, or that he had an agreement to share in any proceeds to be received by the company.

19.     Rudo thereafter helped Luna Loa negotiate deals to buy the South Kohala Property, resell it, and retain and sell AHCs, all without developing any affordable housing units, contrary to Luna Loa's promises in AHA 1.

20.     The steps taken by SULLA, ZAMBER and their co-schemers included, among others, the following:

        a.      In or about February 2015, using knowledge and expertise gained from his position at the OHCD, Rudo identified various landowners who might be interested in buying AHCs. Rudo thereafter drafted letters from Luna Loa to those landowners soliciting offers for the purchase of AHCs acquired through AHA 1. Rudo emailed the letters to ZAMBER, for his signature on behalf of Luna Loa.

        b.      On or about February 10, 2015, Budhabhatti sent an email to Rudo, thanking him "for compiling such a valuable list" of large landowners in the County because "[w]ith judicious use, we can generate a market frenzy" for the purchase of the AHCs.

c.      On or about April 7, 2015, Luna Loa sold four AHCs obtained from AHA 1 for $200,000. The proceeds were deposited into a bank account belonging to Luna Loa.

d.      On or about April 24, 2015, Luna Loa entered agreements under which it would (i) purchase the South Kohala Property from one real estate development company and (ii) resell the property to another real estate development company. SULLA negotiated the resale of the South Kohala Property. After closing the two transactions on the same day, Luna Loa retained 17 AHCs from AHA 1 and took fees of approximately $45,000.

e.      On or about April 29, 2015, a check from Luna Loa in the amount of approximately $11,885.79 was deposited into a bank account controlled by ZAMBER.

f.      Between on or about May 1 and May 12, 2015, payments from Luna Loa totaling approximately $100,000 were deposited into a bank account controlled by Rudo.

g.      On or about May 11, 2015, a check from Luna Loa in the amount of approximately $2,475.31 was deposited into a bank account controlled by SULLA.

h.      Between on or about September 24 and December 9, 2015, checks from Luna Loa totaling approximately $2,600 were deposited into a bank account controlled by ZAMBER.

i.      On or about March 15, 2016, Budhabhatti and ZAMBER sold five AHCs from AHA 1 for $150,000. The proceeds were deposited into a bank account belonging to Luna Loa.

j.      On or about March 24, 2016, a payment from Luna Loa in the amount of approximately $70,000 was deposited into a bank account controlled by Rudo. On the same day, approximately $7,500 from Luna Loa was deposited into a bank account controlled by ZAMBER.

k.      On or about May 10, 2016, ZAMBER requested that the OCHD approve the transfer of four AHCs belonging to West View (collectively owned and controlled by SULLA, ZAMBER, and their co-schemers) to Luna Loa. The request was approved with Rudo's assistance.

l.      On or about May 24, 2016, Luna Loa sold 12 AHCs for approximately $384,000. The proceeds were deposited into a bank account belonging to Luna Loa.

m.      On or about May 26, 2016, approximately $19,250 from Luna Loa was deposited into a bank account controlled by ZAMBER.

n.      Between on or about August 26 and December 21, 2016, checks from Luna Loa totaling approximately $179,800 were deposited into a bank account controlled by Rudo.

## B. The Kailua-Kona property

21.      On or about December 17, 2014, Budhabhatti formed West View, a company he owned along with ZAMBER and Rudo, and for which SULLA served as an attorney. On or about September 18, 2015, ZAMBER was given power of attorney over the company.

22.      In or about September 2015, Rudo sent an email from his official County address to the owner of approximately 13 acres of land in Kailua-Kona, Hawaii, known as Lots 16-A, 16-B and 16-C of the Kealakehe Homesteads ("the Kailua-Kona Property"), explaining the benefits of owning AHCs. Rudo made it appear as if he was acting in the County's best interest to provide affordable housing, when in fact he was attempting to persuade the owner to sell the Kailua-Kona Property to West View, without revealing his ownership interest in that company.

23.      Rudo then took various steps to obtain the OHCD's approval of an AHA ("AHA 2") under which West View was granted 104 AHCs in exchange for West View's promise to develop approximately 52 affordable housing units on the Kailua-Kona Property, which it did not own. ZAMBER signed AHA 2 on behalf

14

of West View, knowing that the company intended to resell the property rather than develop it.

24.     On or about December 17, 2015, West View bought the Kailua-Kona Property for approximately $14,076 and 46 AHCs acquired through AHA 2. Approximately $13,076.16 of the funds were obtained from Luna Loa.  ZAMBER signed the purchase contract on behalf of West View.

25.     On or about December 27, 2016, based on Rudo's recommendation, the County released West View from "any and all obligations" to develop affordable housing under AHA 2 on approximately seven acres of the Kailua-Kona Property.  ZAMBER signed the County's release on behalf of West View.

26.     Following the partial release of West View's obligations to develop affordable housing, SULLA, ZAMBER, and their co-schemers engaged in various transactions that benefited them financially, including the following:

       a.     West View rented a six-acre portion of the Kailua-Kona Property for approximately $84,000 a year to a developer who intended to build affordable housing there.  Between January 8, 2021 and April 15, 2021, West View distributed approximately $18,732 of the rental payments to Rudo in return for his official acts.

       b.     West View sold two AHCs obtained through AHA 2 for $60,000.  Rudo attempted to facilitate the transfer of the two AHCs by drafting a

letter for ZAMBER's signature in which West View sought the OHCD's approval

of the transfer.  On or about January 2, 2019, Budhabhatti informed ZAMBER he

intended to use a portion of the proceeds as a down payment on "a Hawaii-like

home … in [the] Bay area."

      c.     On or about June 4, 2021, West View sold the approximately

seven-acre portion of the Kailua-Kona Property for approximately $950,000,

without having developed any affordable housing on any part of the Kailua-Kona

Property.  The proceeds of that sale were intended to be distributed among

ZAMBER, Rudo, and Budhabhatti, but were seized by the United States.

27.    SULLA, ZAMBER, and their co-schemers concealed Rudo's

ownership interest in West View while Rudo took official acts on behalf of the

County with regard to AHA 2.  SULLA, ZAMBER and their co-schemers

continued to conceal Rudo's interest in West View, and his receipt of benefits from

the company, even after Rudo was prohibited from having involvement with the

company for one year following his December 2018 resignation from the OHCD.

### C.  The Waikoloa property

28.    On or about November 16, 2016, SULLA formed Plumeria, a

company he owned along with ZAMBER and Rudo, and for which SULLA

assumed operational control.

29.     Rudo thereafter took various steps to obtain the OHCD's approval of an AHA ("AHA 3") that permitted a real estate development company to develop certain land and satisfy an affordable housing obligation to the County by donating approximately 11.8 acres of land in Waikoloa, Hawaii ("the Waikoloa Property") to Plumeria.  When AHA 3 was approved, it listed Plumeria as "a Hawaii non-profit corporation," as required by County regulations.  In fact, and as SULLA, ZAMBER, and Rudo then knew, Plumeria was a for profit corporation formed by SULLA for the purpose of selling the Waikoloa Property.

30.     In June 2017, Rudo helped the County finalize the terms of AHA 3, under which the developer promised to convey the Waikoloa Property to Plumeria. In reliance on Plumeria's representations that it was a non-profit corporation, the County released the developer under AHA 3 from its obligations to provide affordable housing.

31.     SULLA and ZAMBER subsequently took various steps to formalize Rudo's involvement in Plumeria and conceal it.  The steps taken by SULLA and ZAMBER included, among others, the following:

        a.      On or about January 22, 2018, SULLA formed two trusts— Active REI and Ad Astra— benefitting Rudo.  SULLA listed ZAMBER's assistant as the trustee for Active REI and ZAMBER as the secretary.  SULLA listed ZAMBER as the trustee for Ad Astra and himself as secretary.

17

b.      On the same day, SULLA formed SZ Ventures, LLC.  SULLA and ZAMBER signed an agreement to operate SZ Ventures on the understanding that "no profits or cash distributions shall be guaranteed until [the Waikoloa property] is sold."

c.      On or about January 23, 2018, Dezign Artz, LLC (a company previously formed by SULLA and owned by Rudo) and SZ Ventures entered an agreement under which they would jointly own Plumeria.  The agreement between Dezign Artz and SZ Ventures provided that "no profits or cash distributions shall be guaranteed until [the Waikoloa property] is sold."

d.      On or about January 28, 2018, SULLA removed Rudo as owner of Dezign Artz and replaced him with the Active REI and Ad Astra trusts.

32.     On or about January 29, 2018, ownership of the Waikoloa property was conveyed to Plumeria.  The warranty deed, filed by SULLA, listed Plumeria as a for profit corporation.

33.     In or about February 2018, Plumeria agreed to sell the property to another company for $1,500,000.  The sales contract was signed by SULLA on behalf of Plumeria.  On or about May 11, 2018, the sale was completed.

34.     Through a variety of subsequent transactions, the proceeds of the Waikoloa sale were distributed by SULLA and divided among himself, ZAMBER, and Rudo, with Rudo's share constituting bribes and kickbacks.

35.     SULLA, ZAMBER, and Rudo failed to disclose Rudo's ownership interest in Plumeria, or the fact that he was receiving proceeds from the sale of the Waikoloa Property while taking official acts on behalf of the County with regard to AHA 3.

36.     On October 10, 2018, in response to an investigation initiated by the State of Hawaii Land Use Commission concerning the Waikoloa Property, and in an attempt to conceal their misconduct, SULLA signed an affidavit omitting the fact that both he and Rudo had an ownership interest in Plumeria.

### III. *Use of wires*

37.     On or about the following dates, within the District of Hawaii and elsewhere, for the purpose of executing, and attempting to execute, the above-described scheme and artifice to defraud, PAUL JOSEPH SULLA, JR. and GARY CHARLES ZAMBER, the defendants, did knowingly transmit and cause to be transmitted, in interstate commerce, certain signs, signals and sounds, that is, the following wire communications, with each such wire communication constituting a separate count of this indictment:

### Kailua-Kona Property

| Count | Date | Interstate Wire Transmission |
|-------|------|------------------------------|
| 2 | 10/4/2018 | Email from SULLA to Rudo indicating that he was "not looking at [the Kailua-Kona project] as an attorney waiting on a fee but as an investor in a subdivision project." |

| Count | Date | Interstate Wire Transmission |
|---|---|---|
| 3 | 1/9/2019 | Wire payment in the amount of approximately $50,000 to an escrow account for the benefit of West View made as a deposit for the purchase of AHCs, which West View acquired through AHA 2. |
| 4 | 4/9/2019 | Email from ZAMBER to the OHCD seeking the OHCD's approval of the transfer of AHCs that West View acquired through AHA 2 and falsely stating West View's commitment to developing affordable housing. |

**Waikoloa Property**

| Count | Date | Interstate Wire Transmission |
|---|---|---|
| 5 | 5/11/2018 | Wire payment in the amount of approximately $1,488,639.14 to an escrow account for the benefit of Plumeria representing the proceeds of the sale of the Waikoloa Property. |
| 6 | 6/6/2018 | Wire payment in the amount of approximately $944,742 to an escrow account for the benefit of Plumeria and used to purchase real estate, the ownership of which was later transferred to Dezign Artz. |
| 7 | 12/6/2018 | Email from SULLA to Rudo, ZAMBER, and another individual attaching SULLA's "analysis of the breakdown of the Plumeria Sale for $1,500,000," listing each of the co-schemer's share of the proceeds. |

All in violation of Title 18, United States Code, Sections 1343 and 1346.

<u>Count 8</u>
Money Laundering
(18 U.S.C. § 1956(a)(1)(B)(i))

38.    The allegations contained in paragraphs 1 through 13 and 15 through 37 are incorporated herein.

20

39.     On or about December 23, 2021, within the District of Hawaii, and elsewhere, PAUL JOSEPH SULLA, JR., the defendant, knowingly conducted a financial transaction affecting interstate commerce, which financial transaction involved the proceeds of specified unlawful activity, that is, honest services wire fraud and conspiracy to commit the same, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, namely a wire transfer in the amount of approximately $500,676.34 from Title Guarantee Escrow Services, Inc. account *6227 to Old Republic Exchange account *3311.

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

<u>First Forfeiture Notice</u>

1.     The allegations contained in Counts 1 through 7 of this Indictment are hereby realleged and incorporated by reference for the purpose of noticing forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.     The United States hereby gives notice to PAUL JOSEPH SULLA, JR. and GARY CHARLES ZAMBER, the defendants, that, upon conviction of Counts 1 through 7 charged in the Indictment, the government will seek forfeiture, in

21

accordance with Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), of any and all property, real or personal, that constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" (as defined in Title 18, United States Code, Section 1956(c)(7), which includes violations of Title 18, United States Code, Sections 1343, 1346, and 1349), or a conspiracy to commit such an offense, including but not limited to the following:

a.      A personal money judgment as to PAUL JOSEPH SULLA, JR. in the amount of at least $551,225, such sum having been obtained directly or indirectly as a result of Counts 1 through 7 listed in this Indictment or is traceable to such property;

b.      A personal money judgment as to GARY CHARLES ZAMBER in the amount of at least $171,792, such sum having been obtained directly or indirectly as a result of Counts 1 through 7 listed in this Indictment or is traceable to such property;

c.      Proceeds in the amount of $938,428.16 from the sale of the real property located at 74-5001 Kiwi Street, Kailua-Kona, Hawaii and designated as Tax Map Key No. (3) 7-4-004-091, which proceeds were seized by the United States on June 4, 2021;

d.      Proceeds in the amount of $752,064.46 from the sale of the real property located at 4426 SE 16th Place, Cape Coral, Florida, which proceeds were received by the United States on November 9, 2021;

e.      Proceeds in the amount of $499,626.34 from the sale of the real property located at 32-1077 Hawaii Belt Road, Ninole, Hawaii and designated as Tax Map Key (3) 3-2-003-024, which proceeds were seized by the United States on January 6, 2022;

f.      Proceeds in the amount of $133,771.33 from the sale of the real property located at 15-2697 Maiko Street, Pahoa, Hawaii, which proceeds were received by the United States on January 31, 2022;

g.      Forty-five affordable housing credits issued by the County of Hawaii to West View Developments, LLC, which credits were seized by the United States on April 4, 2022;

h.      That certain real property known as Lot 16 – B of the Kealakehe Homesteads, being a portion of Grant 6273 to A. Napuupahee, titled in the name of West View Developments, LLC, and designated as Tax Map Key Number (3) 7-4-004-092, together with all appurtenances and improvements; and

i.      That certain real property known as Lot 16 – C of the Kealakehe Homesteads, being a portion of Grant 6273 to A. Napuupahee, titled in the name of

23

West View Developments, LLC, and designated as Tax Map Key Number (3) 7-4-004-014, together with all appurtenances and improvements.

      3.     If by any act or omission of the defendants, any of the property subject to forfeiture described in paragraph 2 of this forfeiture section:

     a.  cannot be located upon the exercise of due diligence;

     b.  has been transferred or sold to, or deposited with, a third party;

     c.  has been placed beyond the jurisdiction of the court;

     d.  has been substantially diminished in value; or

     e.  has been commingled with other property which cannot be subdivided without difficulty,

the United States of America will be entitled to forfeiture of substitute property up to the value of the property described above in paragraph 2, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

Second Forfeiture Notice

      1.     The allegations contained in Count 8 of this Indictment are hereby realleged and incorporated by reference for the purpose of noticing forfeitures pursuant to Title 18, United States Code, Section 982.

      2.     The United States hereby gives notice to PAUL JOSEPH SULLA, JR., the defendant, that, upon conviction of the offense charged in Count 8 of this

Indictment, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 982(a)(1), of any and all property, real or personal, involved in the violations of Title 18, United States Code, Section 1956, alleged in Count 8 of this Indictment, and any property traceable to such property, including but not limited to: proceeds in the amount of $499,626.34 from the sale of the real property located at 32-1077 Hawaii Belt Road, Ninole, Hawaii and designated as Tax Map Key (3) 3-2-003-024, which proceeds were seized by the United States on January 6, 2022.

     3.    If by any act or omission of defendant, any of the property subject to forfeiture described in the preceding paragraph:

       a.  cannot be located upon the exercise of due diligence;

       b.  has been transferred or sold to, or deposited with, a third party;

       c.  has been placed beyond the jurisdiction of the court;

       d.  has been substantially diminished in value; or

       e.  has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to forfeiture of substitute property up to the value of the property described above in the preceding paragraph, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United

States Code, Section 982(b)(1).

DATED:    July 21, 2022, in Honolulu, Hawaii.

A TRUE BILL

*/s/ Foreperson*

FOREPERSON

CLARE E. CONNORS
United States Attorney
District of Hawaii

MOHAMMAD KHATIB
Assistant United States Attorney

26